**MINYARD FOOD STORES, INC., Petitioner,**

v.

**Brenda GOODMAN, Respondent.**

No. 01–0734.

Supreme Court of Texas.

Argued April 17, 2002.

Decided June 13, 2002.

Rehearing Denied Aug. 22, 2002.

Bryant Scott McFall, Andrew T. Turner, Ronald Wayne Chapman, Ogletree Deakins Nash Smoak & Stewart, Dallas, for petitioner.

William Paul Rossini, Vial Hamilton Koch & Knox, Steven B. Thorpe, Carla S. Hatcher, Thorpe, Hatcher & Washington, LLP, Dallas, for respondent.

Justice BAKER delivered the opinion of the Court.

In this defamation case, we decide whether an employee who defames another employee to his employer during a workplace misconduct investigation was acting within the course and scope of his employment. A jury found that the culpable employee was acting within the course and scope and awarded both actual and punitive damages. The trial court rendered judgment on the verdict for actual damages against the defaming employee and the employer jointly and severally, but it disregarded the jury's punitive damages award. A divided court of appeals affirmed the trial court's judgment. 50 S.W.3d 131, 143. The court of appeals held that the employee's defamatory statements during the investigation were made within the scope and course of his employment, and thus, the employer was liable. 50 S.W.3d at 139.

We conclude there is no evidence to support the jury's finding that the culpable employee was acting within the course and scope of his employment when he defamed another employee to his employer during the employer's investigation for workplace misconduct. Accordingly, we reverse the court of appeals' judgment in part and render judgment that the defamed employee take nothing from the employer.

## I. BACKGROUND

Les Heflin, Brenda Goodman, Sheila Hughes, and Alejandra Marks all worked for Minyard's Store No. 83 in Highland Village in Denton, Texas. Heflin was the store manager. Goodman served as the point of sale coordinator, responsible for ensuring that merchandise was properly and accurately priced in the store. Hughes and Marks served as checkers.

On January 15, 1998, Hughes accused Goodman of having an affair with Heflin. Goodman was in her office at the store when Hughes approached her screaming, "You better pack your bags. I'm fixing to get you fired." Hughes pointed to Heflin and said to Goodman, "There's the man you've been having the affair with." Additionally, Hughes called Gary Flowers, Minyard's District Manager, and said she wished to speak with him. Hughes told

Flowers that Heflin had confided in her about Heflin and Goodman kissing and hugging on a few occasions. Hughes believed Goodman discovered Heflin telling Hughes this and was "taking it out" on her. Shortly thereafter, Flowers arrived at the store. Flowers spoke with Marks who reported that Heflin had similarly told her that he and Goodman had kissed and hugged.

Flowers then confronted Heflin, who admitted to kissing and hugging Goodman but denied having a "sexual relationship" with her. Heflin also admitted that he kissed Marks. On that same day, Heflin gave Flowers a written statement outlining these admissions. In contrast, Goodman told Flowers that she had allowed Heflin to rub her shoulders and that she had given him a "friendly hug," but she denied ever kissing him.

Following Flowers' January 15 investigation, Minyard transferred Heflin, Goodman, and Marks to different Minyard stores. While at her new store, Goodman received about four to six calls a day from other Minyard employees who heard that Minyard transferred her for having an affair with Heflin. Further, while attempting to purchase groceries at the new store, a checker made an unsolicited comment to Goodman that it must have been difficult to tell her husband that Minyard had transferred her because of the accusation that Goodman had an affair with Heflin. After that conversation, Goodman concluded that she could not stay at Minyard and thus she resigned.

Goodman sued Minyard, Hughes, Marks, and Heflin for defamation. She alleged that Hughes' and Marks' allegations to Minyard and other Minyard employees about Goodman's "illicit sexual relations" with Heflin defamed her. Further, Goodman alleged that Heflin's oral and written statements to Minyard management that he had kissed her on several occasions defamed her. A jury found that Heflin defamed Goodman but Hughes and Marks did not. The jury further found that Heflin's defamatory statements were made in the course and scope of his employment at Minyard. The jury awarded actual damages of $325,000 and $500,000 punitive damages. The trial court disregarded the punitive damages award and rendered judgment on the verdict for the actual damages against Minyard and Heflin, jointly and severally.

Minyard and Heflin appealed the adverse judgment. Minyard challenged the legal and factual sufficiency of the evidence that Heflin was acting in the scope and course of his employment with Minyard when he defamed Goodman. Heflin argued that the evidence was insufficient to support the jury's finding that he defamed Goodman. A divided court of appeals affirmed the trial court's judgment against both Minyard and Heflin. 50 S.W.3d at 142–43. The court of appeals concluded that, even if an employee's act is unauthorized or without the employer's approval, this does not mean that the employee acted outside the scope of his employment. Rather, the court of appeals determined, an employer is liable for its employee's acts, even if the specific act is unauthorized or contrary to express orders, so long as the act is done while the employee is acting within his general authority and for the employer's benefit. The court of appeals observed that Heflin's cooperation with an upper management investigation concerning claims about Heflin's workplace misconduct was clearly within Heflin's authority and responsibility as a Minyard store manager. Consequently, the court of appeals concluded that there was some evidence to allow a jury to reasonably find that Heflin was acting

within the course and scope of his employment when he made the defamatory statements to Flowers. 50 S.W.3d at 143.

On the other hand, though the dissent concurred with affirming the judgment against Heflin, it disagreed that there was evidence to support Minyard's liability. The dissent concluded that, despite Minyard's requiring Heflin to cooperate with Flowers' investigation, there was no evidence that Heflin lied about Goodman to accomplish any objective for which he was employed. Thus, the dissent would have reversed the judgment against Minyard, rendered judgment that Goodman take nothing on her claims against Minyard, and affirmed only the judgment finding Heflin liable. 50 S.W.3d at 143.

The sole issue we decide is whether there is legally sufficient evidence to support the jury finding that Heflin was acting in the course and scope of his employment with Minyard when he defamed Goodman—orally and in the written statement—to Flowers during the workplace misconduct investigation.

## II. THE PARTIES' CONTENTIONS

### A. MINYARD

Minyard argues that, as a matter of law and policy, an employee who defames another employee to his employer during an investigation for workplace misconduct is not acting in the course and scope of his employment. Minyard contends that an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired. *See Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex.1971); *Lyon v. Allsup's Convenience Stores, Inc.*, 997 S.W.2d 345, 347 (Tex.App.-Fort Worth 1999, no pet.). Minyard argues that this

case is analogous to *Lyon* in which an employee sued Allsup's for a supervisor's defamation. *Lyon*, 997 S.W.2d at 347. The *Lyon* court of appeals affirmed the trial court's summary judgment order, holding that the supervisor's defamation "obviously was not done to accomplish any object for which [he] was hired." *Lyon*, 997 S.W.2d at 348. Here, Minyard contends, Heflin's lie to Flowers about Goodman kissing him was likewise not done to accomplish any object for which he was hired. Nevertheless, Minyard asserts, the court of appeals ignored *Lyon* and other Texas precedent to hold to the contrary. *See, e.g., Wal–Mart Stores, Inc. v. Lane*, 31 S.W.3d 282 (Tex. App Corpus Christi 2000, pet. denied); *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147 (Tex.App.-El Paso 1996, writ denied); *Saenz v. Family Sec. Ins. Co. of Am.*, 786 S.W.2d 110 (Tex.App.-San Antonio 1990, no writ).

Minyard further contends that there is a critical distinction in Texas between defaming someone *to* one's employer and defaming someone *for* one's employer. *Compare Lyon*, 997 S.W.2d at 345 *with Hooper v. Pitney Bowes, Inc.*, 895 S.W.2d 773, 777 (Tex.App.-Texarkana 1995, writ denied). Minyard points out that, in *Lyon*, the employee lied to further his own ends, and thus, the employer was not liable. *See Lyon*, 997 S.W.2d at 348. In contrast, in *Hooper*, the employer's investigators lied based on their belief that they were acting in the employer's interests, thereby making the employer liable. *See Hooper*, 895 S.W.2d at 777. Thus, according to Minyard, *Lyon*, not *Hooper*, applies, because Heflin lied *to* and not *for* Minyard.

### B. GOODMAN

Goodman acknowledges that, generally, respondeat superior liability is established when an employee acts within the course and scope of employment. *See Van*

*Cleave,* 468 S.W.2d at 357. However, Goodman contends that *Texam Oil Corp. v. Poynor,* 436 S.W.2d 129 (Tex.1968), establishes a different test in cases involving an employee's defamatory statements. Goodman argues that, in the defamation context, the test is whether the employee had a duty to the employer and made defamatory statements while discharging that duty. Thus, Goodman asserts, because Heflin had a duty to cooperate in Minyard's workplace misconduct investigation, the statements he made while discharging that duty were within the scope and course of his employment. *See Hooper,* 895 S.W.2d at 777. Goodman notes that the Fifth Circuit, applying Texas law, reached a similar conclusion when it held that lies told during an investigation can be imputed to the employer. *See Rodriguez v. Sarabyn,* 129 F.3d 760, 771 (5th Cir.1997).

Finally, Goodman argues that, even under the *Van Cleave* test that Minyard and the dissent in the court of appeals advocate, Minyard is liable. Goodman contends that, under this test, the appropriate question is not whether the defamation accomplished any purpose for which Heflin was hired, but whether his participating in the investigation accomplished a purpose for which he was hired. *See Rodriguez,* 129 F.3d at 771; *Hooper,* 895 S.W.2d at 777.

### III. APPLICABLE LAW

#### A. STANDARD OF REVIEW

■ In reviewing a no evidence claim, we view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If more than a scintilla of evidence exists, it is legally sufficient. *Browning–Ferris,*

*Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex. 1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing·conclusions by reasonable minds about a vital fact's existence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

#### B. COURSE AND SCOPE OF EMPLOYMENT

■ The general rule is that an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired. *Van Cleave,* 468 S.W.2d at 357. This Court has also held that, for an employee's acts to be within the scope of employment, "the conduct must be of the same general nature as that authorized or incidental to the conduct authorized." *Smith v. M Sys. Food Stores, Inc.,* 156 Tex. 484, 297 S.W.2d 112, 114 (1957). In other words, if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation. *ITT Consumer Fin. Corp.,* 932 S.W.2d at 158.

In an early defamation case, the Eleventh Court of Appeals held that "[a]n action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty. Neither express authorization nor subsequent ratification is necessary to establish liability." *Great Atl. & Pac. Tea Co. v. Harris,* 75 S.W.2d 974, 976 (Tex.Civ.App.-Eastland 1934, writ dism'd.). This Court adopted that rule in 1968. *Poynor,* 436 S.W.2d at 130; *see also Wagner v. Caprock Beef Packers Co.,* 540 S.W.2d 303, 305 (Tex.1976).

## IV. ANALYSIS

■ The issue in this case is whether there is any evidence that the defamatory statements Heflin made to Flowers about Goodman during Flowers' workplace misconduct investigation were made in the course and scope of Heflin's employment with Minyard. We conclude that there is no evidence to support the jury's finding that they were.

As a preliminary matter, we reject Goodman's argument that *Poynor* establishes a different liability standard in defamation cases than the general course and scope of employment test. To the contrary, *Poynor's* holding that an employer is liable for its employee's defamation "if such defamation is referable to the duty owing by the agent to the corporation" means the same thing as *Van Cleave's* holding that an employer is liable for its employee's acts conducted "in furtherance of the [employer's] business, and for the accomplishment of the object for which the [employee] is employed." *Compare Poynor*, 436 S.W.2d at 130 ("An action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty.") *with Van Cleave*, 468 S.W.2d at 357 ("[I]n order to render the master liable for an act of his servant, the act must be committed within the scope of the general authority of the servant in furtherance of the master's business and for the accomplishment of the object for which the servant is employed.").

■ Indeed, the primary case upon which Goodman relies refers to the *Poynor* rule and then recognizes that *Poynor's* inquiry requires that the employee's defamation must have occurred while the employee was acting for the employer's benefit. *See Hooper*, 895 S.W.2d at 777. Moreover, this Court cited the *Poynor* rule

in a case in which a manager made unsolicited defamatory calls to an ex-employee's prospective employers. *Wagner*, 540 S.W.2d at 304. In holding that the manager's calls were not referable to or in discharge of any duty he owed the corporation, this Court concluded that there was no evidence that the manager's calling other businesses about the ex-employee was for his employer's benefit or to accomplish an objective of his job. *Wagner*, 540 S.W.2d at 305. Accordingly, in the defamation context, establishing that an employee was acting in the course and scope of his employment—or, in *Poynor's* words, making defamatory statements referable to a duty the agent owed to the corporation— requires evidence that the employee's statements were made in furtherance of the employer's business, and for the accomplishment of the objective for which the employee was employed.

Here, the court of appeals correctly cited the *Poynor* test and, in analyzing the evidence, correctly explained that an employer is liable for its employee's conduct so long as the act is done while the employee is acting within his general authority and for the benefit of the employer. 50 S.W.3d at 138–39 & nn. 16–19 (citing *Poynor*, 436 S.W.2d at 130; *Hooper*, 895 S.W.2d at 776–77). The court of appeals concluded that Heflin was acting within his general authority as the store manager when he answered Flowers' questions about the allegations that Heflin had an improper relationship with another employee. 50 S.W.3d at 139. Consequently, the court of appeals determined, this was "some evidence from which a jury could reasonably find that Heflin was acting in the course and scope of his employment." 50 S.W.3d at 139.

But the court of appeals' analysis concerns only Heflin's general authority as a store manager and does not include an

analysis of whether Heflin's defamatory remarks were in furtherance of Minyard's business and for the accomplishment of the object for which Heflin was employed. The dissent in the court of appeals correctly recognized the flaw in this analysis. *See* 50 S.W.3d at 143.

We conclude there is no evidence to show that Heflin's defaming Goodman during the investigation were made in the course and scope of Heflin's employment with Minyard. While we agree the evidence demonstrates that Minyard's policies require employees to participate in workplace misconduct investigations—just as Heflin did here—these policies do not demonstrate that Heflin's defaming Goodman to Flowers during the investigation would further Minyard's business and accomplish a purpose of Heflin's job. There is a critical distinction between defaming someone to one's employer and defaming someone for one's employer. *Compare Lyon,* 997 S.W.2d at 348 (holding that employer was not liable for manager's lie that another employee stole company funds, because there was no evidence that manager, who actually stole the money himself, lied to accomplish any object for which he was hired) *with Hooper,* 895 S.W.2d at 777 (holding that employer was liable for defamatory statements managers made to other employees about a supervisor during the managers' investigation of that supervisor, because the evidence showed that the statements were made in the managers' authorized effort to investigate the supervisor's alleged misconduct). And Goodman ignores this distinction when she asserts that the Fifth Circuit's *Rodriguez* decision and *Hooper* are analogous to her case. In *Rodriguez* and *Hooper,* the courts applied the same test we do today to determine the employer liable for defamatory statements. *See Rodriguez,* 129 F.3d at 771; *Hooper* 895 S.W.2d at 777. But, in these cases, the evidence showed that the defamatory statements were the kind that the employees were "authorized and expected to make and were closely connected to the performance of their duties." *Rodriguez,* 129 F.3d at 771; *see also Hooper,* 895 S.W.2d at 777. Here, on the other hand, the evidence shows only that Heflin lied *to* Minyard and not that Heflin lied *for* Minyard.

Consequently, there is no evidence to support an inference that Heflin's defamatory statements about Goodman to Flowers during the investigation were referable to any duty owed to Minyard, or, in other words, were in furtherance of Minyard's benefit, and for the accomplishment of the object for which the employee was hired. *See Wagner,* 540 S.W.2d at 306; *Van Cleave,* 468 S.W.2d at 357; *Poynor,* 436 S.W.2d at 130; *Lyon,* 997 S.W.2d at 345. Thus, we find no evidence to support the jury's finding that Heflin was acting in the course and scope of his employment with Minyard. *See Bradford,* 48 S.W.3d at 754.

## V. CONCLUSION

We conclude there is no evidence to support the jury's finding that Heflin was acting within the course and scope of his employment with Minyard when he defamed Goodman to Flowers' during Flowers' workplace misconduct investigation. Accordingly, we reverse the court of appeals' judgment in part and render judgment that Goodman take nothing from Minyard.